UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-134(2) (DWF/BRT)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **PLEA AGREEMENT AND SENTENCING STIPULATIONS** |
| v. | |
| AFSHIN "ALEX" FARAHAN, | |
| Defendant. | |

The United States of America and defendant AFSHIN "ALEX" FARAHAN (hereinafter referred to as the "defendant") agree to resolve this case on the terms and conditions that follow. This plea agreement binds only the defendant and the United States Attorney's Office for the District of Minnesota (hereinafter "the United States" or "the Government"). This agreement does not bind any other United States Attorney's Office or any other federal or state agency.

1. **Charges**. The defendant agrees to plead guilty to Count One of the Indictment, which charges the defendant with conspiracy to engage in insider trading, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) and 78ff(a), and 17 C.F.R. § 240.10b-5. The defendant fully understands the nature and elements of the crime with which he has been charged. At the time of sentencing, the government agrees to move to dismiss the remaining counts of the Indictment.

2. **Factual Basis**. The defendant is pleading guilty because he is in fact guilty of Count One of the Indictment. In pleading guilty, the defendant admits the

1

following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to the United States Sentencing Guidelines:

## Introduction

Beginning no later than January 2018, and continuing until at least in or about August 2020, in the District of Minnesota, and elsewhere, defendant conspired and agreed with Doron "Ron" Tavlin and David Gantman to commit an offense against the United States, that is, to willfully use and employ, by use of any means or instrumentality of interstate commerce, directly and indirectly, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device and scheme to defraud; and (b) engaging in an act, practice, and a course of business which operated and would operate as a fraud and deceit upon any person, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Background

Company A was a medical device company based in Ireland with global operations, which primarily operated from its executive headquarters in Minneapolis, Minnesota. Company A's common stock traded on the New York Stock Exchange.

Company B was an Israeli-company with a United States headquarters in Orlando, Florida, that, among other things, offered robot-assisted spinal surgery technology for use by health care providers in the treatment of patients. Company

B's common stock was traded on the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ").

During the time period relevant to the indictment, Doron "Ron" Tavlin was employed as a Vice President of Business Development at Company B. Tavlin resided in Minneapolis, Minnesota. As an executive of Company B, Tavlin owed a fiduciary duty and other duties of trust and confidence to Company B to maintain the confidentiality of any material, nonpublic information he learned and obtained during the course of his employment at Company B. Among other things, these duties required that Tavlin abstain from disclosing to others (i.e., "tipping") any material, nonpublic information about Company B, including nonpublic information about upcoming mergers or acquisitions.

Tavlin and defendant had been close personal friends since the early 2000s. Defendant resided in or near Los Angeles, California, but spent much of his time in the Twin Cities area of Minnesota, where he maintained his businesses as well as multiple personal relationships with family and friends, including Tavlin.

Defendant and David Gantman had been friends since the 1990s. Gantman resided in Mendota Heights, Minnesota. Tavlin and Gantman knew each other through their mutual friendship with defendant. Gantman knew that Tavlin was a senior employee at Company B.

**Manner and Means of the Insider Trading Conspiracy**

It was part of defendant's conspiracy to commit insider trading with Tavlin and Gantman that:

Defendant, Tavlin, and Gantman agreed to misappropriate for their own personal benefit material, nonpublic information about Company B.

Tavlin provided this material, nonpublic information to defendant at a time when Tavlin knew he was under a duty to protect the confidentiality of the information and not to use it—or provide it to anyone else to use—to trade in Company B's securities. Tavlin received a personal benefit by providing this information to defendant as a gift to a friend and with the intention to benefit himself and defendant, and knowing that defendant would use the material, nonpublic information to trade in Company B's securities. Defendant knew this information was material, nonpublic information that Tavlin had disclosed to him in breach of Tavlin's duties to Company B and for defendant's use in trading Company B's securities. Defendant further knew that Tavlin received a personal benefit by providing him with the information as a gift based on their friendship and with the intention to benefit Tavlin.

Defendant, in turn, provided this material, nonpublic information about Company B to Gantman at a time when he knew Tavlin was under a duty to protect the confidentiality of the information and not to use it—or provide it to anyone else to use—to trade in Company B's securities. Defendant received a personal benefit by providing this information to Gantman as a gift to a friend and with the intention to benefit Gantman, and knowing that Gantman would use the material, nonpublic information to trade in Company B's securities. Gantman knew this information was material, nonpublic information that defendant had disclosed to him from Tavlin in

breach of Tavlin's duties to Company B and for Gantman's use in trading Company B's securities. Gantman further knew that defendant received a personal benefit by providing him with the information as a gift based on their friendship.

As part of his employment at Company B, Tavlin learned material, nonpublic information concerning discussions between Company B and Company A about Company A's potential acquisition of Company B, which would likely result in an increase in Company B's stock price. Tavlin misappropriated that material, nonpublic information in violation of the fiduciary and other duties of trust and confidence he owed to Company B.

Tavlin and defendant further agreed that defendant would pay money to Tavlin in exchange for the material, nonpublic information that Tavlin provided to defendant, which included using proceeds of some of the profits from defendant's purchases and sales of Company B securities that were the result of material, nonpublic information that Tavlin tipped to defendant.

Tavlin provided defendant with periodic updates about the acquisition discussions involving Company A and Company B and with advice about when defendant should make corresponding transactions involving Company B stocks, all of which Tavlin typically provided during in-person meetings and through electronic communications and phone calls.

By at least August 2018, Tavlin knew that discussions were advancing between Company B and Company A and that the acquisition of Company B, and resultant increase in Company B's stock price, were likely to occur. Tavlin tipped

this information to defendant as a gift to his friend and with the intention to benefit defendant and himself knowing that defendant would use this information to trade in Company B's securities. Tavlin instructed defendant to keep the tipped information secret.

By at least August 2018, defendant, in turn, provided to Gantman the same material, nonpublic information about Company A's increasingly likely acquisition of Company B. Defendant also instructed Gantman to keep the information secret. Defendant provided this information to Gantman as a gift to his friend and with the intention to benefit Gantman knowing that Gantman would likely use this information to trade in Company B's securities. Based on the information provided by defendant, Gantman knew: (i) that the source of the information was Farahan's long-standing and close personal friend, Tavlin; (ii) that Tavlin was a senior employee at Company B; and (iii) that Tavlin had misappropriated the material, nonpublic information from Company B in breach of a duty of trust and confidence to keep such information confidential.

After their receipt of material, nonpublic information about Company B, defendant and Gantman each engaged in purchases of Company B securities in August 2018 and September 2018. On or about September 20, 2018, Company A publicly announced that it would acquire Company B for $58.50 per share. The day after the public announcement, on or about September 21, 2018, defendant and Gantman each sold all of their respective Company B securities for a substantial combined profit of at least $500,000.

After the September 20, 2018 public announcement of Company A's acquisition of Company B, defendant, Tavlin, and Gantman engaged in discussions amongst themselves concerning the fact that FINRA was conducting an inquiry into certain trading in Company B securities that occurred prior to the public announcement. Ultimately, Tavlin responded falsely to FINRA's inquiry, in that he disavowed knowing any of the parties who engaged in the subject transactions involving Company B securities, which included defendant and Gantman.

**Overt Acts in Furtherance of the Insider Trading Conspiracy**

To effect the object of the insider trading conspiracy, defendant, Tavlin, and Gantman committed and caused to be committed the following overt acts, among others, in the District of Minnesota, and elsewhere:

On or about June 13, 2018, in exchange for material, nonpublic information provided by Tavlin about Company B, defendant made a $20,000 payment in the form of a check drawn on a Fidelity Investments account that defendant controlled to the benefit of Individual A, who was Tavlin's son.

In order to conceal the illicit nature of the payment to benefit Tavlin's son, defendant falsely stated on the memo line of the June 13, 2018 check that it was for the "Purchase of Rugs," which defendant knew at the time was false.

On or about Friday, August 10, 2018, defendant flew from California to Minnesota, and stayed at the Minneapolis home of his friend, Tavlin.

After defendant's August 10, 2018 arrival at Tavlin's Minneapolis home, Tavlin, in breach of his duties of trust and confidentiality to Company B, provided

Farahan with material, nonpublic information about Company A's likely acquisition of Company B, about which Tavlin instructed defendant to keep secret.

After defendant's August 10, 2018 arrival at Tavlin's Minneapolis home, Tavlin, in breach of his duties of trust and confidentiality to Company B, further instructed defendant to purchase quickly Company B stocks for himself and to invest on Tavlin's behalf.

On or about August 13, 2018, after defendant received material, nonpublic information from Tavlin, defendant purchased approximately 2,000 shares of Company B stock, which was priced at approximately $46.75 per share, for a total of approximately $93,500.

The same day, on or about August 13, 2018, Tavlin and defendant spoke on the phone. After their telephone call ended, defendant purchased approximately 2,000 additional shares of Company B stock, which was priced at approximately $47.75 per share, for a total of approximately $95,500.

No later than on or about August 15, 2018, defendant met with Gantman in Minnesota. Among other things, defendant tipped to Gantman the same material, nonpublic information about Company A's likely acquisition of Company B that defendant had just learned from Tavlin. Defendant informed Gantman that the material, nonpublic information came from Tavlin, whom Gantman knew was a senior employee at Company B. Defendant instructed Gantman to keep the information secret.

Between approximately August 16, 2018, and prior to approximately September 21, 2018, defendant continued to buy additional shares in Company B using funds he controlled in personal and business accounts maintained at Fidelity Investments, as summarized below:

| Date (on or about) | Transaction |
| --- | --- |
| August 13, 2018 | Defendant's purchase of 2,000 shares of Company B stock at $46.75 per share for approximately $93,500 |
| August 13, 2018 | Defendant's purchase of 2,000 shares of Company B stock at $47.75 per share for approximately $95,500 |
| August 16, 2018 | Defendant's purchase of 2,000 shares of Company B stock at $42.35 per share for approximately $84,700 |
| August 24, 2018 | Defendant's purchase of 500 shares of Company B stock at $47.46 per share for approximately $23,730 |
| August 24, 2018 | Defendant's purchase of 3,495 shares of Company B stock at $47.58 per share for approximately $166,292.10 |
| August 24, 2018 | Defendant's purchase of 3,000 shares of Company B stock at $47.40 per share for approximately $142,200 |
| August 29, 2018 | Defendant's purchase of 2,000 shares of Company B stock at $47.25 per share for approximately $94,500 |
| September 5, 2018 | Defendant's purchase of 2,000 shares of Company B stock at $46.15 per share for approximately $92,300 |
| September 5, 2018 | Defendant's purchase of 2,000 shares of Company B stock at $46.05 per share for approximately $92,100 |
| September 17, 2018 | Defendant's purchase of 3,000 shares of Company stock at $48.8459 per share for approximately $146,537.70 |

On or about September 21, 2018, the day after Company B publicly announced its acquisition by Company A for $58.50 per share, defendant sold all of the Company B shares that he purchased based upon material, nonpublic information tipped to him by Tavlin. In total, defendant received a profit of approximately $247,500.

Following the public announcement of the acquisition, Tavlin learned that there was a regulatory investigation of certain trading in Company B securities that occurred prior to the September 20, 2018 publicly-announced acquisition of Company

B by Company A. After Tavlin learned of the regulatory inquiry, he communicated about the inquiry with defendant, who further communicated about the inquiry with Gantman. Among other things, Tavlin, defendant, and Gantman learned that the regulatory inquiry identified: (a) a list of people at Company B—which included Tavlin—who possessed material, nonpublic information leading up to the public announcement on September 20, 2018, of Company A's acquisition of Company B; and (b) another list of parties who traded in Company B securities prior to the public announcement on September 20, 2018, which included defendant and Gantman.

Tavlin notified defendant that defendant appeared on the list of parties who bought Company B securities. Tavlin told defendant that he was not going to disclose his relationship with defendant. Tavlin later responded to FINRA's inquiry by falsely denying that he recognized any names on a list of persons and entities that purchased Company B securities, which included defendant and Gantman's names.

In addition, defendant informed Gantman that Gantman's name appeared on the list of parties who bought Company B securities prior to the public announcement of the acquisition, as part of the regulatory inquiry.

On or about October 25, 2019, Tavlin and defendant met in or near Minneapolis, Minnesota. Among other things, Tavlin asked defendant to provide him with money in exchange for the material, nonpublic information that Tavlin had provided defendant about Company B leading it up to its acquisition by Company A.

On or about October 25, 2019, defendant provided a $25,000 payment to Tavlin in the form of a check drawn from a Wells Fargo Bank account that defendant controlled.

On or about August 14, 2020, Tavlin asked defendant for additional money in exchange for the material, nonpublic information that Tavlin had provided defendant concerning Company B.  More specifically, Tavlin sent defendant an email message titled "Investment."  Among other things, Tavlin asked defendant "to go over the accounts so we can settle up from our past activities.  It's been almost two years and you will have to backtrack quite a bit. When you figure out the balance you can either write me or [TAVLIN's son] a check."

3. **Waiver of Pretrial Motions**.  The defendant understands and agrees that the defendant has certain rights to file pre-trial motions in this case.  As part of this plea agreement, and based upon the concessions of the United States within this plea agreement, the defendant knowingly, willingly, and voluntarily gives up the right to have any pending motions resolved and to file any additional pre-trial motions in this case.  The defendant agrees that, by pleading guilty, he is withdrawing any motions previously filed.

4. **Waiver of Constitutional Trial Rights.** The defendant understands that he has the right to go to trial.  At trial, the defendant would be presumed innocent, have the right to trial by jury or, with the consent of the United States and of the Court, to trial by the Court, the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, the right to subpoena witnesses to

11

testify for the defense, the right to testify and present evidence, and the right to be protected from compelled self-incrimination. The defendant understands that he has the right to an attorney at every stage of these proceedings and, if necessary, one will be appointed to represent him. The defendant understands that he has the right to persist in a plea of not guilty and, if he does so, he would have the right to a public and speedy trial. By pleading guilty, the defendant knowingly, willingly, and voluntarily waives each of these trial rights, except the right to counsel. The defendant understands that a guilty plea is a complete and final admission of guilt and, if the Court accepts the guilty plea, the Court will adjudge the defendant guilty without a trial.

5. **Additional Consequences**. The defendant understands that as a result of his conviction, he could experience additional consequences, such as the loss of the right to carry firearms, the right to vote, and the right to hold public office.

6. **Statutory Penalties**. The defendant understands that Count One of the Indictment (conspiracy to engage in insider trading, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) and 78ff(a), and 17 C.F.R. § 240.10b-5) is a felony offense that carries the following statutory penalties:

    a.    a maximum of 5 years in prison;

    b.    a supervised release term of up to 3 years;

    c.    a maximum fine of $ 250,000, or twice the gross gain or loss caused by the offense, whichever is greatest;

    d.    assessment to the defendant of the costs of prosecution, imprisonment, and supervision, as defined in 28 U.S.C. §§ 1918(b) and 1920;

  e. a mandatory special assessment of $100 under 18 U.S.C. § 3013(a)(2)(A); and

  f. the possible loss of eligibility for federal benefits pursuant to 21 U.S.C. § 862(a)(1).

7. **Guidelines Calculations**. The parties acknowledge that the defendant will be sentenced in accordance with 18 U.S.C. § 3551, *et seq.*  Nothing in this plea agreement should be construed to limit the parties from presenting any and all relevant evidence to the Court at sentencing.  The parties also acknowledge that the Court will consider the United States Sentencing Guidelines in determining the appropriate sentence and stipulate to the following guidelines calculations.  The parties stipulate to the following guidelines calculations:

  a. <u>Base Offense Level</u>.  The parties agree that the base offense level is 8.  U.S.S.G. § 2B1.4.

  b. <u>Specific Offense Characteristics</u>. The parties agree that the offense level should be increased by 12 levels because gain resulting from the offense was more than $250,000 but less than $550,000.  U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(G).  The parties agree that no other specific offense characteristics apply.

  c. <u>Chapter 3 Adjustments</u>.  The parties agree that, other than acceptance of responsibility, no other Chapter 3 adjustments apply.

  d. <u>Acceptance of Responsibility</u>.  The government agrees to recommend that the defendant receive a 2-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). As the defendant has timely notified the government of his intention to enter a plea of guilty, the government agrees to recommend that the defendant receive an additional 1-level reduction pursuant to U.S.S.G. § 3E1.1(b).  Whether these reductions will be imposed shall be determined by the Court in its discretion. However, the defendant understands and agrees that the government's recommendations are conditioned upon the

13

        following: (1) the defendant testifies truthfully during the change of plea and sentencing hearings; (2) the defendant provides full, complete and truthful information to the United States Probation Office in the pre-sentence investigation; and (3) the defendant engages in no conduct inconsistent with acceptance of responsibility before the time of sentencing, including frivolously denying facts in the Presentence Report.

    e.    <u>Criminal History Category</u>. The parties believe that, at the time of sentencing, the defendant will fall into Criminal History Category I. U.S.S.G. § 4A1.1. This does not constitute a stipulation, but a belief based on an assessment of the information currently known. The defendant's actual criminal history and related status will be determined by the Court based on the information presented in the Presentence Report and by the parties at the time of sentencing. The defendant understands that if the presentence investigation reveals any prior adult or juvenile sentence which should be included within his criminal history under the U.S. Sentencing Guidelines, the defendant will be sentenced based on his true criminal history category, and he will not be permitted to withdraw from this Plea Agreement. U.S.S.G. § 4A1.1.

    f.    <u>Guidelines Range</u>. If the adjusted offense level is 17, and the criminal history category is I, the Sentencing Guidelines range is **24 to 30 months of imprisonment**.

    g.    <u>Fine Range</u>. If the adjusted offense level is 17, the Sentencing Guidelines fine range is $10,000 to $95,000. U.S.S.G. § 5E1.2(c)(3).

    h.    <u>Supervised Release</u>. The Sentencing Guidelines require a term of supervised release of at least 1 year up to a maximum supervised release term of 3 years. U.S.S.G. § 5D1.2(a)(2).

8.    **Revocation of Supervised Release**. The defendant understands that if the defendant were to violate any supervised release condition while on supervised release, the Court could revoke the defendant's supervised release, and the defendant could be sentenced to an additional term of imprisonment up to the statutory maximum set forth in 18 U.S.C. § 3583(e)(3). *See* U.S.S.G. §§ 7B1.4, 7B1.5. The

defendant also understands that as part of any revocation, the Court may include a requirement that the defendant be placed on an additional term of supervised release after imprisonment, as set forth in 18 U.S.C. § 3583(h).

9. **Discretion of the Court**. The foregoing stipulations are binding on the parties, but do not bind the Probation Office or the Court.  The parties understand that the Sentencing Guidelines are advisory and their application is a matter that falls solely within the Court's discretion.  The Court will make its own determination regarding the applicable Guidelines factors and the applicable criminal history category.  The Court may also depart from the applicable Guidelines range.  If the Court or the Probation Office determines that the applicable guideline calculations or the defendant's criminal history category is different from that stated above, the parties may not withdraw from this agreement, and the defendant will be sentenced pursuant to the Court's determinations.

10. **Agreements as to Sentencing Recommendation**. The parties are free to recommend whatever sentence they deem appropriate.  The parties reserve the right to make a motion for departures from the applicable Guidelines range pursuant to 18 U.S.C. § 3553(a), to oppose any such motion made by the opposing party, and to argue for a sentence outside the applicable Guidelines range.  If the Court does not accept the sentencing recommendation of the parties, the defendant will have no right to withdraw his guilty plea.

11. **Special Assessment**. The Guidelines require payment of a special assessment in the amount of $100 for each felony count of which the defendant is

convicted, pursuant to Guideline § 5E1.3. The defendant agrees to pay the special assessment prior to sentencing.

12.     **Restitution Agreement**. The parties agree that the Mandatory Victim Restitution Act does not apply because, as set forth in 18 U.S.C. § 3663A(c)(3)(b), determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

13.     **Disclosure of Assets.**  The defendant will fully and completely disclose to the United States Attorney's Office the existence and location of any assets in which the defendant has any right, title, or interest, or over which the defendant exercises control, directly or indirectly, including those assets held by a spouse, nominee or other third party, or any business owned or controlled by the defendant. The defendant agrees to assist the United States in identifying, locating, returning, and transferring assets for use in payment of fines and/or forfeiture ordered by the Court. The defendant agrees to complete a financial statement within two weeks of the entry of his guilty plea. The defendant further agrees to execute any releases that may be necessary for the United States to obtain information concerning the defendant's assets and expressly authorizes the United States to obtain a credit report on the defendant to evaluate his ability to satisfy financial obligations imposed by the Court. If requested by the United States, the defendant agrees to submit to one or more asset interviews or depositions under oath.

14. **Forfeiture.** The defendant agrees to forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) in conjunction with 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the conspiracy to engage in insider trading charged in Count 1 of the indictment. The United States reserves its right to seek a money judgment forfeiture, to forfeit substitute assets, and to forfeit additional directly forfeitable property.

The defendant agrees that the United States may, at its option, forfeit such property through civil, criminal or administrative proceedings, waives any deadline or statute of limitations for the initiation of any such proceedings, and abandons any interest he may have in the property. The defendant waives all statutory and constitutional defenses to the forfeiture and waives any right to contest or challenge in any manner (including direct appeal, habeas corpus, or any other means) such forfeiture on any grounds. To the extent the defendant has sought remission or otherwise challenged the forfeiture of the above-described property, he withdraws any such challenges.

15. **Waivers of Appeal and Collateral Attack**. The defendant hereby waives the right to appeal any non-jurisdictional issues. This appeal waiver includes, but is not limited to, the defendant's waiver of the right to appeal guilt or innocence, sentence and restitution, and the constitutionality of the statutes to which the defendant is pleading guilty. The parties agree, however, that excluded from this waiver is an appeal by defendant of the substantive reasonableness of a term of imprisonment above 30 months' imprisonment. The defendant also waives the right

to petition under 28 U.S.C. § 2255 except based upon a claim of ineffective assistance of counsel.

The defendant has discussed these rights with the defendant's attorney. The defendant understands the rights being waived, and the defendant waives these rights knowingly, intelligently, and voluntarily.

The United States agrees to waive its right to appeal any sentence except the government may appeal the substantive reasonableness of a term of imprisonment below 24 months' imprisonment.

16.     **FOIA Requests.**  The defendant waives all rights to obtain, directly or through others, information about the investigation and prosecution of this case under the Freedom of Information Act and the Privacy Act of 1974, 5 U.S.C. §§ 552, 552A.

17.     **Complete Agreement**.   The defendant acknowledges that he has read this plea agreement and has carefully reviewed each provision with his attorney. The defendant further acknowledges that he understands and voluntarily accepts every term and condition of this plea agreement.

This plea agreement, along with any agreement signed by the parties before entry of the plea, is the entire agreement and understanding between the United States and the defendant.

ANN M. BILDTSEN
First Assistant United States Attorney for the United States Acting Under Authority Conferred by 28 U.S.C. § 515

Date: 7-21-2022

BY: MATTHEW S. EBERT
KIMBERLY A. SVENDSEN
Assistant United States Attorneys

Date: 7/21/22

AFSHIN FARAHAN
Defendant

Date: 7/21/22

ANDREW BIRRELL, ESQ.
Counsel for Defendant